In re SPEER BROS.

(District Court, D. Oregon. April 9, 1906.)

No. 931.

BANKRUPTCY—PARTNERSHIP—PROVABLE DEBTS.

A postmaster, who was managing partner in a firm, used money of the government in paying debts of the partnership, and the sureties on his bond furnished the money to make up the defalcation. Thereupon he executed notes of the firm to such sureties, covering the amounts advanced, to which no objection was made by the other partner. *Held*, that such notes were not without legal consideration and were provable in bankruptcy as debts of the partnership.

In Bankruptcy. On review of decision of referee.

L. H. McMahan, for claimants.

B. S. Pague, for petitioners.

WOLVERTON, District Judge. Speer Bros., a copartnership composed of Alonzo P. Speer and M. Homer Speer, doing a mercantile business in Aumsville and Mehama, Marion county, Or., were adjudged bankrupt on April 27, 1905. On May 12, 1905, Thomas Johnson, W. G. Merrifield, and Peter Donker each filed a claim against the bankrupts' estate, based upon a note given each, of date April 17, 1905, for the sum of $1,545.39, purporting to be executed by Speer Bros. Somewhat later the La Grande Creamery Company, a creditor of the estate, interposed an objection to the allowance of each of these three claims by the referee, assigning as a reason therefor that the payees of said notes did not, nor did any of them, loan the amount specified therein to the copartnership, but that, on the other hand, the money was advanced to, and for the individual use of, A. P. Speer. To this objection there was an answer filed by the payees August 3, 1905, setting up that the said Speer Bros., long prior to the bankruptcy proceedings, received from the payees, and for the use and benefit of the copartnership, the aggregate amount of said notes, namely, $4,636.17, the whole of which was used by the partnership, in the usual course of its business, in purchasing goods for the firm and in paying the debts thereof. A reply having been filed, putting in issue these allegations of the answer, a trial was had before the referee, who found that the notes were valid claims against the estate of the bankrupts, and entered an order accordingly. The order bears date December 13, 1905. On December 22d, W. N. Daniels, a creditor, filed a petition praying for a review of said order to be had by the district judge, which paper was entitled "In the District Court of the United States for the District of Oregon." The referee certified the matter to the District Court on February 15, 1906. On February 24th Johnson, Merrifield, and Donker interposed a motion to dismiss the petition. This motion was brought on for trial later, and the questions raised thereby were argued, together with the merits of the case, and submitted for determination.

A number of reasons are assigned why the petition should be dismissed. However, as I have come to the conclusion that the order

of the referee should be sustained on its merits, it is unnecessary that I notice any of the assignments for a dismissal.

Coming, then, to the merits of the controversy, the facts are that on or about the 1st of September, 1904, Speer Bros. were largely involved; their liabilities ranging from $28,000 to $30,000, and their assets being estimated at from $18.000 to $20,000. A. P. Speer was postmaster at Aumsville. His bondsmen for the faithful performance of his trust were Johnson, Merrifield, and Donker. Between September 1, 1904, and the latter part of March, 1905, A. P. Speer became a defaulter to the government in the sum of $4,636.17. In order to reimburse the government, these bondsmen borrowed the money from W. N. Daniels, and paid it over to the government, or, perhaps, to be exact, they paid it to Speer, and he to the postal inspector for the government. This transaction was closed about April 1, 1905. On April 17th Speer Bros., through the agency of A. P. Speer, gave the firm note to each of these sureties for Speer in the sum of $1,545.39, being for one-third each of the amount paid the government to make good the defalcation of A. P. Speer as postmaster. These are the notes against which objections are interposed by Daniels as not being, in legal parlance or effect, firm liabilities.

It is shown, perhaps not as satisfactorily as it might have been, but with reasonable probability, that the funds of the government were used by Speer in the payment of the debts and in the business of the copartnership. Speer is the only witness who testifies touching this subject, and there is nothing in the record to contradict or weaken his statement, except that he is not as clear or full as he might or should have been. He says, however:

"In the next month (October) September payments were pressing me, and I paid out to different parties different amounts, but I will mention the larger amounts, the amount I felt that rather got the best of me. The next large payment I made was to Chas. F. Heins. On the 15th of October I paid him $500. I ought not to have done it. I should have told him to take his store and done as he pleased with it. * * * I paid that money, and following that I gave M. Seller & Co. $524, and I then wrote to the Portland creditors and asked for time on the other accounts, and in place of that they jumped on me, and things got away from me. * * * I used the money altogether in paying our debts. The trouble was I had to pay Speer Bros.' obligations to such an extent that it overdrew on that account and left the other account short, and it continued that way until it got as large as it did. Q. Well, then, as I understand by that, this shortage was occasioned by using these funds in the business of Speer Bros.? A. Yes; indirectly, they went there."

It is further in evidence that A. P. Speer was the business manager for Speer Bros. His brother Homer, and partner in the business, has interposed no objection to these notes of Johnson, Merrifield, and Donker as legitimate demands against the copartnership, thus in effect ratifying the act of A. P. Speer in executing the paper in the name of the firm. The crucial controversy, therefore, is whether other creditors of the firm can object, as the La Grande Creamery Company has attempted to do, to the notes as a legal demand against the bankrupt estate of Speer Bros. The inquiry, Was there a consideration for the execution of these notes on the part of the firm? will settle the question. Speer having used the money of the government in

the business of Speer Bros. would, it has been held, by cogent analogy, entitle the government in equity to repayment out of the firm assets. "Where a partner," say the learned authors of the American & English Encyclopedia of Law (volume 22, p. 164), "does an act on his own behalf, or otherwise, so as not to bind the firm, the general rule is that the firm will not be bound merely by reason of having obtained the benefit of that act. Thus, if a partner, without real or apparent authority, borrows money, the lender cannot recover this money from the firm, although the money may have been applied for its benefit. It has been held, however, that if the money so borrowed has been expended in paying the legitimate debts of the firm, or for any other legitimate purpose of the firm, the lender is entitled in equity to the repayment of so much of the money as he can show to have been so applied."

In the present case the government is not seeking repayment, but the sureties for the government are. They have, not voluntarily, but under their bond guarantying the responsibility of A. P. Speer, furnished the funds to reimburse the government for those which Speer used in paying the debts of the firm. And is there not here a legal consideration for the execution of the notes to these sureties? If there is, then the validity of the notes cannot be questioned. Counsel admits that there is a moral consideration, but not a legal one. Why not? If the lender of money to a firm, through the assumed agency of a partner having no authority thereto, has an equitable right against the firm for repayment where the money has been used in the firm's business, why is there not here more than a moral obligation on the part of the company to repay these bondsmen the money which they were compelled to pay to make good the money which the firm has had the benefit of in the payment of its debts, and for use in its business. I am impressed that it is something more than a mere moral obligation. The money used was money which the firm ex bono et æquo should repay to these bondsmen. The obligation is one, possibly, that could not have been enforced as against the firm in the first instance, upon the payment alone by the sureties of their obligation to the government; but, when the firm has recognized its accountability to the sureties by its solemn promise by note of hand, there is ample behind the paper to sustain or uphold it in the way of consideration. Surely the firm could not question it, and I am unable to determine by what better reason the creditors of the firm could question it. They are not injured by the transaction, because they have received, indirectly it may be, the very funds that the notes of the firm were given for in the way of reimbursement to those who have advanced them. They are no worse off than if the money of the government had never been used in the payment of the debts of the firm and these bondsmen had never been called upon to respond for the defalcation of Speer.

I hold, therefore, because it seems eminently equitable and just, that the notes of Johnson, Merrifield, and Donker are valid claims against the estate of the bankrupt firm, and the decision of the referee will be affirmed.